UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| NAOMI J. BRUCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 3:12-cv-00235-TLS-CAN |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

On May 7, 2012, Plaintiff, Naomi J. Bruce ("Bruce") filed her complaint in this Court. On August 10, 2012, Bruce filed an opening brief requesting that this Court reverse the ALJ's decision or remand this matter to the Commissioner of Social Security ("Commissioner"). On November 14, 2012, the Commissioner filed a response. On December 5, 2012, Bruce filed a reply. The undersigned now enters a report and recommendation pursuant to this Court's referral order, 28 U.S.C. § 636(b)(1), and 42 U.S.C. § 405(g).

**I. PROCEDURE**

On September 21, 2009, Bruce filed her application for Title II disability insurance benefits ("DIB"). On that same date, Bruce filed a Title XVI application for supplemental security income ("SSI"). *See* 20 C.F.R. §§ 404.1520 *et seq.*, 416.920 *et seq.*[1] Bruce alleged disability beginning September 1, 2008, in both applications. Initially these claims were denied on November 17, 2009, and then again on reconsideration on February 8, 2010. Consequently, Bruce filed a Request for Hearing on March 4, 2010. The hearing commenced on December 1, 2010, and was held via video conference between the ALJ in Falls Church, Virginia, and Bruce in Indianapolis, Indiana. An impartial vocational expert ("VE") participated in the hearing by

---

[1] *While the regulations for Title II and Title XVI are codified separately within the Code of Federal Regulations, their terms are essentially identical. Thus, this report and recommendation will reference only 20 C.F.R. § 404.1520 et seq.*

telephone. The ALJ found that Bruce met the insured status requirements of the Social Security Act ("the Act") through March 31, 2011. In addition, the ALJ found that Bruce had not engaged in substantial gainful activity since September 1, 2008, and that Bruce had severe impairments of cervical and right arm pain, anxiety disorder, posttraumatic stress disorder ("PTSD"), and chronic obstructive pulmonary disease ("COPD"). The ALJ then found that neither Bruce's physical impairments nor her mental impairments, considered singly or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Bruce retained the residual functional capacity ("RFC") to perform sedentary work. Specifically, the ALJ found that Bruce could lift and/or carry about ten pounds occasionally and less than ten pounds frequently; stand and/or walk with normal breaks for a total of two hours in an eight hour workday; sit with normal breaks for a total of six hours in an eight hour workday; and operate hand and/or foot controls by pushing or pulling without limitation. However, the ALJ found that Bruce could not do any overhead reaching, could only occasionally reach in other directions, and was limited to frequent handling, feeling, and fingering. Further, the ALJ found that Bruce could occasionally climb ramps or stairs, balance, stoop, and crouch; never climb ropes, ladders and scaffolds, kneel or crawl; and must avoid concentrated exposure to hazards such as machinery, heights, extreme cold or heat, wetness, humidity, fumes, odors, bases, and poor ventilation.

Next, the ALJ found that Bruce had no relevant work, but could perform work that existed in significant numbers in the national economy based on her age, education, work experience, and RFC. Particularly, the ALJ found that Bruce retained the RFC to work as a Surveillance System Monitor, a job with approximately 350 positions available in Indiana. The ALJ, therefore, concluded that Bruce was not disabled.

Accordingly, the ALJ issued a decision denying Bruce's application for DIB and SSI on December 9, 2010. On December 27, 2010, Bruce made a request for review to the Appeals Council that was denied on March 6, 2012. Consequently, the ALJ's decision became the Commissioner's final decision. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981. Bruce now seeks this Court's review of the ALJ's decision.

## II.    ANALYSIS

### A.    Facts

Bruce was 38 years old at the date of the alleged disability's onset and 40 years old at the time of the administrative hearing. Bruce currently resides in Tippecanoe County, Indiana. Bruce received her high school equivalency diploma and attended one year of trade school. Bruce left the workforce in 2008, has not worked since, and has no past relevant work.

#### 1.    Physical Impairments

Beginning in September 2009, Bruce sought treatment for pain in her back and right arm and was referred to Dr. Randy Gehring, a neurosurgeon. As a result of this pain, Bruce underwent back surgery on December 30, 2009. Although diagnostic testing after surgery showed significant improvement, Bruce reported continued pain during ER visits on February 9 and February 18, 2010. During these visits Bruce was able to walk normally but the hospital staff noted that she was "rambling, occasionally tearful and her speech [was] slurred" (Tr. 797–803). Further, on February 9, 2010, hospital staff noted their concern about Bruce's drug behavior due to her agitation, hostility, and demand for strong pain medications. (Tr. 797). In a follow-up examination on February 25, 2010, Dr. Gehring found no obvious focal weakness and

a stable gait. Further, an MRI showed no cervical spine abnormality. Dr. Gehring found x-rays of Bruce's hip to be normal even though she exhibited "some giveaway" weakness. (Tr. 71).[2]

Four months after surgery, on April 22, 2010, Dr. Gehring ordered that Bruce be weaned off narcotic pain medications and scheduled her for a pain management evaluation with Dr. John Sturman of Indiana University Pain Management Clinic. At this evaluation, Dr. Sturman prescribed Oxycodone for pain, Flexeril to relax muscles, and Alprazolam for anxiety. While Bruce testified at the administrative hearing that she suffered side effects from these medications, Dr. Sturman noted that Bruce did not complain of any adverse effects during a visit to the clinic on June 28, 2010. On October 16, 2010, Bruce complained of lower back pain, neck pain and right upper numbness to Dr. Abdul Sankari, her primary care physician, but a request for a new MRI was denied by her insurance.

Bruce also suffered from COPD and received medication from Dr. Sankari to treat it. Because Bruce smoked one-half to one pack of cigarettes a day, Dr. Sankari prescribed a smoking cessation medication. On January 27, 2009, and May 17, 2009, Dr. Sankari noted that Bruce's COPD was stable with normal breathing, no shortness of breath, or cough. Bruce was brought to the ER in April of 2009, after breathing smoke during a house fire but was released after her lungs were cleared. Subsequently, at a visit on September 15, 2009, Dr. Sankari noted that Bruce's lungs were clear despite continued smoking and complaints of a sore throat and cough. At a consultative exam on November 7, 2009, a spirometry test indicated clear lungs with no wheezing and significant improvement post medication.

On November 17, 2009, one year prior to the ALJ hearing, Dr. Brill, a non-examining medical consultant, completed a physical RFC assessment form for the Disability Determination

---

[2] Giveaway weakness refers to a doctor's finding of poor effort on strength testing by a patient indicating that they may have been exaggerating pain's effect in order to preserve their disability status. Muriel D. Lezak et al., *Neuropsychological Assessment* 326 (4th ed. 2004).

Bureau. Dr. Brill found that the record indicated that Bruce could lift and/or carry 10 pounds frequently and 20 pounds occasionally, and could stand and/or walk for up to 6 hours in an 8-hour workday.

On June 24, 2010, Dr. Gehring wrote a letter to Bruce indicating his opinion that, although a specific diagnosis was unclear, Bruce was not capable of working. Subsequently, on October 12, 2010, Dr. Gehring completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" questionnaire. Dr. Gehring indicated that Bruce could not lift 10 pounds or more on an occasional or frequent basis; could not stand or walk for more than two hours in an 8-hour workday; and could sit less than 6 hours in an 8-hour workday. Dr. Gehring noted that Bruce's limitations were pain-related and limited her ability to reach, handle, balance, stoop, or crouch to only occasionally. Finally, Dr. Gehring noted that Bruce could frequently perform fingering and feeling tasks but would likely be absent from work for more than four days a month due to her impairments.

On November 11, 2010, Dr. Sankari completed a "Physician's Certification" form regarding Bruce's ability to do work-related activities. Dr. Sankari indicated Bruce could lift and/or carry less than 10 pounds; could stand and/or walk less than 2 hours in an 8-hour workday; and could never kneel, crawl, climb, balance, crouch, stoop, reach, handle, finger or feel.

In her DIB and SSI applications, Bruce also alleged physical disability based on diagnoses of hypertension and urinary tract infections. The ALJ dismissed these as non-severe impairments that could cause no more than a minimal restriction on her ability to perform basic work activities. Further, several undiagnosed medical impairments including Hepatitis C, osteoporosis, and fibromyalgia were alleged. The ALJ did not consider these impairments

5

because the record showed they were undiagnosed and therefore, not medically determinable impairments.

## 2. Mental Impairments

Along with her physical impairments, Bruce alleged disabling mental impairments. These mental impairments were primarily diagnosed as anxiety or panic disorder and depression. After establishing care with Dr. Sankari in 2009, Bruce was referred to psychiatrist Aldo A. Buonanno for a psychological assessment. On October 13, 2009, based on Bruce's self-reported history and description of her symptoms, Dr. Buonanno diagnosed Bruce with panic disorder with agoraphobia, attention deficit hyperactivity disorder ("ADHD"), and PTSD. Further, Dr. Buonanno assigned Bruce a Global Assessment of Functioning ("GAF") score of 50 and prescribed Xanax for anxiety, Adderall for ADHD, and Rozerem for insomnia.[3] Dr. Buonanno recommended therapy but Bruce did not seek counseling until February 22, 2010.

On November 2, 2009, Dr. Hill, a state disability services psychologist, reviewed the medical record to determine the severity of Bruce's mental impairments. Dr. Hill based her conclusions on Dr. Buonanno's examination on October 13, 2009. Dr. Hill found that Bruce had moderate limitations in her ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to interact appropriately with the public; and ability to set realistic goals or make independent plans (Tr. 71). Further, Dr. Hill found that Bruce's daily living activities appeared within normal limits; that her attention and concentration were moderately impacted but still suited for simple tasks; and that Bruce had difficulty with social functioning but could cooperate and tolerate necessary interactions to perform tasks. Dr. Hill indicated that Bruce could complete repetitive tasks on a

---

[3] Global Assessment of Functioning Scale refers to the 100 point rating tool used to determine the psychological, social, and occupational functioning of people over 18 years of age. *Diagnostic and Statistical Manual of Mental Disorders* (Am. Psychiatric Assoc. 4th ed., text rev. 2000).

sustained basis without special considerations, preferably in an environment with minor social interaction.

On February 22, 2010, four months after meeting with Dr. Buonanno, Bruce met with Jean Hines, a social worker and therapist at Family Services, Inc. At this initial assessment, Bruce reported a diagnosis of bipolar disorder with agoraphobia. Ms. Hines noted that Bruce appeared manipulative and presented herself as highly dysfunctional. Ms. Hines observed that Bruce's house was immaculate. Afterward, Bruce declined counseling services and Ms. Hines closed her case on April 8, 2010.

On March 3, 2010, Timothy Swain, a social worker at Cummins Behavioral Health Systems, Inc. ("CBHS"), assigned Bruce a GAF score of 49 and diagnosed her with dysthymic disorder, PTSD, ADHD, and personality disorder. Swain recommended weekly case management, group therapy, monthly medication management and individual therapy twice monthly. Bruce declined group therapy and case management but attended counseling on March 29, April 15, and May 25, 2010.

On May 24, 2010, psychiatrist Barbar Hasan evaluated Bruce, assigned her a GAF score of 49, and diagnosed her with depressive disorder, PTSD, and personality disorder. Dr. Hasan did not diagnose ADHD but noted Bruce's self-reported prior diagnosis. Further, Dr. Hasan noted that Bruce lived alone in an apartment; was not close to her family; had regular contact with female friends; attended cultural events; did crafts; ate out; meditated; played cards and games; read; and visited with friends and family. Bruce also reported to Dr. Hasan that she had difficulty at work due to absenteeism and conflict with supervisors and co-workers. Dr. Hasan noted that Bruce was not currently taking antidepressant medications but was taking Xanax for

anxiety. Dr. Hasan recommended that Bruce taper off Adderall because ADHD was not a current issue.

On June 4, 2010, upset about the psychiatric evaluation, Bruce terminated her counseling and medication management with CBHS. Bruce reported that she would not change medications and would continue getting her current psychotropic medications from Dr. Sankari. The record indicates that Bruce was never hospitalized due to psychiatric impairment.

### 3. Claimant Testimony

At the ALJ hearing, Bruce testified that she is disabled due to back pain radiating into her right arm, COPD, anxiety, depression, and PTSD. Bruce stated she had panic attacks between three to seven times a week and numbness in her right arm. Bruce testified that she cries often and stays in bed for hours at least four or five times a week. At the hearing, Bruce alleged medication side effects including blurred vision, dizziness, hypertension, bowel and bladder problems, and fatigue. Bruce testified she naps two hours per day, cannot lift very much, and cannot grip objects. Finally, Bruce indicated that she has muscle spasms and hand numbness. (Tr. 14-18).

### 4. Vocational Expert Testimony

At the administrative hearing, the ALJ asked the VE to consider a hypothetical individual who had the same vocational background and RFC as Bruce. (Tr. 45–46). The VE testified that a person with Bruce's RFC, reflected in the hypothetical presented, could work as a circuit board assembler. *Id.* After some discussion and a determination that this job required reaching frequently, the ALJ dismissed circuit board assembler as a potential job for Bruce. (Tr. 48). Subsequently, the VE testified that a hypothetical individual with Bruce's vocational background could perform the job of a surveillance systems monitor. (Tr. 58). The VE indicated that this

job was "primarily a hands-free occupation" and that 350 such positions existed in Indiana at the time of the hearing with 21,000 positions available nationally. (Tr. 50, 58).

### B. Standard of Review

In reviewing disability decisions, district courts shall affirm the ALJ's decision so long as it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g) (2006); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). To be considered substantial, evidence must support a conclusion a reasonable mind would accept as adequate. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the ALJ's opinion lacks evidentiary support or does not adequately discuss the issues it cannot stand. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, so long as the ALJ builds a logical bridge from the evidence to his conclusion, the court may not substitute its own judgment or re-weigh the evidence. *Haynes*, 416 F.3d at 626. This logical bridge does not require a "complete written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Rather, the ALJ's opinion must explain his analysis with enough detail and clarity to provide for adequate appellate review. *Haynes*, 416 F.3d at 626. The ALJ's legal conclusions are reviewed *de novo* but factual determinations are given deferential treatment as "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness." *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); *see also Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In the instant case, Bruce must establish disability in order to collect DIB or SSI. *See* 42 U.S.C. § 423(a)(1)(D). Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." *Id.* The SSA has established a sequential five-part test to determine whether a claimant's impairment meets the above definition. 20 C.F.R. § 404.1520. The ALJ must establish whether: (1) the claimant is involved in substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment or combination thereof; (3) the claimant's impairment or combination thereof meets or equals one of the impairments listed in the regulations, precluding substantial gainful activity; (4) the impairment impedes the claimant's RFC so as to preclude pursuing past relevant work; and (5) given the RFC, age, education and work experience, the claimant's ability to adjust to other work existing in the national economy. *Id.* The burden of proof is on the claimant until it shifts to the Commissioner at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Disability is established through an affirmative answer at either step three or step five. *Briscoe*, 425 F.3d at 352. At step three, the Commissioner acknowledges disability if the claimant's impairment is listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpt. P, § 404. However, if the impairment is not listed, the ALJ will assess the claimant's RFC to determine the claimant's ability to pursue past relevant work at step four or ability to adjust to other work in the national economy at step five. 20 C.F.R. § 404.1520(e)-(g).

### C. Issues for Review

This Court must ascertain whether substantial evidence supports the ALJ's decision that Bruce was not disabled because she could perform work that existed in the national economy. Bruce argues that the decision is not supported by substantial evidence because (1) the ALJ did not consider all of her impairments when determining disability under step two; (2) the ALJ's RFC determination was flawed; and (3) the ALJ's hypothetical question at step five did not establish a job existing in significant numbers.

### 1. The ALJ's disability determination at step two properly evaluated Bruce's physical and mental impairments.

Bruce seeks a remand from this Court for further review of the medical evidence. Specifically, Bruce contends that the ALJ failed to consider diagnoses of ADHD, depression, and personality disorder, which she claims limit her concentration, persistence, and pace. Bruce claims that the ALJ's failure to label these disabilities as "severe" constitutes reversible error.

Under the regulations, a "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). For a claimant's mental impairments to be deemed severe, the medical evidence must establish that the impairment resulted in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.03–12.08. An ALJ's failure to label an impairment as "severe" is not reversible error so long as the ALJ finds other severe impairments and continues with the five-step sequential evaluation. *Brown v. Astrue*, No. 3:07-cv-99-WGH-RLY, 2009 WL 722299, at *10 (S.D. Ind. Mar. 18, 2009) (citing *Perez v. Barnhart*, No. 02 C6876, 2003 WL 22287386, at *9 (N.D. Ill. Sept. 30, 2003)). While an ALJ is required to "consider limitations and restrictions imposed by all of an individual's impairments" when determining a claimant's RFC, step two is only a threshold step "to eliminate consideration of individuals who have only slight impairments." *Brown*, 2009 WL 722299, at *10 (citing *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n. 2 (7th Cir. 1984); *see also* SSR 96-8p. Thus, at the initial step-two screening, so long as the ALJ finds that one or more impairments are "severe" and proceeds to the next step, the test is not offended. 20 C.F.R. § 404.1521(a).

In this case, the ALJ deemed Bruce's cervical and right arm pain, anxiety disorder, PTSD, and COPD as "severe" and proceeded to step three of the sequential test. The ALJ found that Bruce's ADHD, depression, and personality disorder did not result in the decompensation or marked restrictions required to meet the severity requirement. Specifically, the ALJ indicated that these impairments did not restrict Bruce's daily living because she was still able to prepare light meals, do light housekeeping and laundry, and drive a vehicle. (Tr. 67). The ALJ found that these impairments did not restrict Bruce's social functioning because she is still able to shop, initiate a greeting if she sees someone she knows, and ask for assistance if she cannot find something. (Tr. 67–68). The ALJ found that Bruce's difficulties with concentration, persistence, and pace were moderate but did not reach the level of a marked limitation. (Tr. 68). Finally, the ALJ noted that Bruce had not experienced any episodes of decompensation that were of extended duration. Thus, the ALJ's exclusion of some impairments does not constitute reversible error. The ALJ's disability determination at step two properly evaluated Bruce's physical and mental impairments.

### 2. The ALJ's RFC determination is consistent with the record and supported by substantial evidence.

Bruce also seeks a remand from this Court for further consideration of the medical evidence when determining her RFC. Specifically, Bruce contends that the ALJ failed to consider all of her impairments, violated the treating physician rule, and based his determination on a boilerplate credibility assessment. Bruce asserts that these failures resulted in a flawed RFC determination constituting reversible error.

A claimant's RFC demonstrates their ability to do work activities despite limitations caused by medically determinable impairments. SSR 96-8p. When determining a claimant's RFC, an ALJ must evaluate all relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(3). The

record includes medical signs, diagnostic findings, claimant's testimony about severity and limitations due to impairments, statements by treating or examining physicians and psychologists, third party witness reports and any other relevant evidence. SSR 96-7p. However, it is the claimant's responsibility to provide medical evidence showing how his impairments affect his functioning. 20 C.F.R. § 404.1512(c). Therefore, when the record does not support specific physical or mental restrictions on a claimant's work-related activity, the ALJ must find that the claimant has no related functional limitations. *See* SSR 96-8p.

### a. Substantial evidence supports the weight the ALJ gave to Bruce's disabilities when determining her RFC.

When determining RFC, an ALJ must consider non-medical evidence alongside medical evidence and provide a narrative discussion to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Huber v. Astrue*, 395 Fed. Appx. 299, 302 (7th Cir. 2010). In considering a claimant's symptoms, the ALJ must follow a two-step process. First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain. 20 C.F.R. § 404.1529. Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit functioning. *Id.* Further, when the claimant suffers from a mental impairment, the ALJ's RFC inquiry must include consideration of such factors as the ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting. 20 C.F.R. § 404.1545(c).

Here, Bruce alleges that the ALJ did not consider her diagnoses and treatments for ADHD, depression, and personality disorder when determining her RFC. Bruce contends that these impairments affect her ability to work with others, attend work regularly, and stay on task

while working.  She argues that this exclusion requires remand due to reversible error.  Bruce's argument, however, fails.

In his decision, the ALJ acknowledged all three of these conditions.  (Tr. 69–71).  The ALJ determined that, while these conditions could reasonably cause the symptoms alleged, the medical evidence and Bruce's testimony did not support a finding that they impacted her RFC.  First, the ALJ indicated that Bruce was not taking any antidepressant medications. (Tr. 70).  Second, the ALJ cited Dr. Hasan's notes which indicated that Bruce should "taper off Adderall because ADHD was not a current issue." *Id.*  Third, the ALJ noted that, during a psychiatric evaluation by Dr. Hasan, Bruce claimed that she had "regular contact with female friends and that she attends cultural events, movies, does crafts, eats out, meditates, plays cards and games, reads, sews and visits with friends and family." *Id.*  The ALJ reported this evidence in his opinion and used it to support his finding that these impairments did not cause limitation beyond those found in his RFC finding.  Thus, substantial evidence supports the weight the ALJ gave to Bruce's mental impairments when determining her RFC.

### b. Substantial evidence supports the weight the ALJ gave to the medical opinions of record when determining Bruce's RFC.

A treating physician's opinion is given controlling weight when it is well-supported by clinical techniques and diagnostic testing and is not inconsistent with other medical evidence in the record.  *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).  A "treating physician" is a physician who has provided treatment to the claimant on more than one occasion.  *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009).  Where a treating physician's opinion is well-supported and does not contradict other medical evidence, an ALJ has no basis upon which to refuse it.  *Id.*  However, where contradictory evidence is introduced and well-supported, a treating physician's opinion no longer controls and should be "just one more piece of evidence

for the ALJ to weigh." *Id.* at 377. When a treating physician's opinion is not given controlling weight, the ALJ must consider factors that include: the claimant's examining and treatment relationship with the examiner, the length and nature of the relationship as it relates to the claimant's disability, the opinion's supportability and consistency with the evidence in the record, the specialization of the examiner, and any other factors the court believes tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)–(6). Finally, the ultimate determination of disability is a legal matter reserved for the Commissioner and a statement by a medical source that a claimant is disabled or unable to work does not necessitate a finding of disability by the ALJ. 20 C.F.R. § 404.1527(e).

Here, Bruce alleges that the ALJ did not give "good reasons" for denying the treating physicians' opinions controlling weight. Bruce argues that the ALJ did not discuss the factors in 404 C.F.R. § 404.1527(c) and therefore committed reversible error. This argument fails.

In his decision, the ALJ based his RFC finding on all of the medical evidence of record, including the opinions of four treating physicians. Two of these opinions, written by Dr. Gehring and Dr. Sankari, posit that Bruce was unable to work. Although these opinions were given "significant weight," the ALJ did not give them "controlling weight" because he found them to be inconsistent with the medical record and "with her activities of daily living, including her ability to drive a vehicle." (Tr. 72–73). Further, the ALJ found that diagnostic testing showing "significant improvement, and medical signs that did not always support [Bruce's] subjective complaints of pain" contradicted the doctors' opinions. (Tr. 71). Specifically, x-ray results and an MRI after Bruce's cervical spine surgery looked normal, did not contain any abnormalities, and indicated good alignment and healing. *Id.* Further, Dr. Gehring noted "giveaway" weakness that tended to show pain exaggeration.

Given the ALJ's finding that the treating physicians' opinions contradicted other medical evidence in the record, the ALJ was not bound by them. The ALJ's consideration of the other factors that supported and contradicted the treating physicians' opinions, especially his examination of Bruce's self-reported daily activities and his review of the diagnostic testing performed by her doctors, constitutes "good reason" for denying the treating physicians' opinions controlling weight. Thus, the ALJ gave proper weight to the medical opinions of record when determining Bruce's RFC.

### c. The ALJ's credibility assessment of Bruce was not patently wrong.

When determining RFC, an ALJ must evaluate the credibility of the claimant's statements regarding the symptoms and limitations of their impairment. SSR 96–7p. A claimant's statements regarding the intensity, persistence, and limiting effects of an impairment are most credible when substantiated by objective medical evidence. 20 C.F.R. § 404.1529(c)(2). Given the ALJ's special position to hear, see, and assess witnesses, his credibility determinations are given deference and will be sustained unless they are deemed patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). To be patently wrong, an ALJ's credibility assessment must lack any explanation or support in the record. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). The ALJ should carefully consider subjective symptoms of pain because they may indicate more severe limitations than can be shown by objective medical evidence alone. SSR 96-8p. However, it is the claimant's burden to provide objective medical evidence showing how her impairments affect work-place functioning. 20 C.F.R. § 404.1545(a)(4). Where evidence indicates a claimant failed to take measures to improve her condition, including refusal to take recommended medication, an adverse credibility finding is warranted. SSR 96-7p; *see also Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

Here, Bruce alleges the ALJ erred in evaluating the credibility of her allegations of disability. Bruce argues that the credibility determination was flawed because the ALJ used "boilerplate" language to evaluate her reliability. Thus, Bruce argues the ALJ committed reversible error. This argument also fails.

Bruce's argument that the ALJ restricted his credibility examination to only one sentence of boilerplate language ignores the ALJ's extensive analysis of Bruce's credibility throughout his entire decision. The ALJ noted a social worker's observation that Bruce "appeared to be manipulative and presented herself as highly dysfunctional." (Tr. 70). While Bruce testified that her medications caused side effects including blurred vision, dizziness, hypertension, bowel and bladder problems and fatigue, the ALJ indicated that Bruce "reported no adverse effect from her medications" to Dr. Hasan. (Tr. 72). Thus, the ALJ deemed Bruce's testimony regarding her side effects unpersuasive. Further, the ALJ noted that on various occasions, and against her doctors' opinions, Bruce declined group therapy and case management and refused to change her medications. (Tr. 70). Additionally, the ALJ noted that although Bruce complained of depression, she was not currently taking any antidepressant medications. (*Id.*)

Although the ALJ found that Bruce's medically determinable impairments could reasonably cause the alleged symptoms, Bruce's testimony, taken in light of the objective medical evidence, was deemed not credible. Further, Bruce's unwillingness to follow her doctors' medical advice warrants an adverse credibility determination. Thus, the ALJ's determination did not lack explanation or support from the record and therefore, is not patently wrong.

### 1. The ALJ's determination at step five that Bruce can perform other jobs in the national economy is supported by substantial evidence.

Bruce seeks a remand from this court for further consideration of whether a job exists in the national economy that she can perform given her RFC. First, Bruce contends that the ALJ's

17

hypothetical question to the VE did not adequately match her RFC. Second, Bruce contends that the 350 jobs identified by the VE do not constitute a "significant number" pursuant to the Act. Bruce argues that the ALJ's flawed step five determination constitutes reversible error.

### a. The ALJ's hypothetical question to the VE was not flawed.

At step five, the Commissioner has the burden of establishing that a significant number of jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v). To meet this burden, the ALJ must pose a hypothetical question to the VE that is "supported by the medical evidence in the record." *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). A hypothetical question based on impairments the ALJ believes are supported by the evidence is proper. *Id.* Further, where a VE examines the documentary evidence prior to the hearing, a hypothetical question that omits medical evidence that accurately reflects a claimant's impairments is not improper. *Id.* The ALJ's hypothetical question must orient the VE to the totality of the claimant's limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

Here, Bruce alleges that the hypothetical question posed to the VE was based on a flawed RFC assessment. Having found that the ALJ's RFC determination was not flawed, this argument fails. Bruce then alleges that the hypothetical question did not consider all of her impairments and therefore, should be reversed. This argument also fails.

In his hypothetical question, the ALJ included significant mental limitations which restricted the potential job pool beyond what Bruce's RFC required. Respecting the opinion of Dr. Hill, who indicated Bruce had some difficulty with social functioning, the ALJ included language in his hypothetical question that would limit Bruce's social interactions to "superficial contact with others, incidental for work performed." (Tr. 45) The ALJ's inclusion of the limitations indicated by Dr. Hill was consistent with the record. The ALJ's hypothetical did not include a

limitation with regard to Bruce's deficits in maintaining concentration, persistence, or pace. The ALJ did not include these limitations because the claimant's testimony regarding these limitations was not supported by objective medical evidence. (Tr. 69). The ALJ's decision to omit these limitations from his hypothetical question to the VE does not constitute reversible error because the ALJ's hypothetical question was based on evidence that he believed was supported by the record. Thus, the ALJ's hypothetical question was not flawed and adequately considered all of Bruce's impairments.

### b. The existence of 350 jobs in the national economy constitutes a significant number for purposes of the Act.

The Commissioner bears the burden of proving that the claimant can perform work existing in significant numbers in the national economy. *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009). While there is no bright-line rule defining how many jobs constitute a "significant number," the Seventh Circuit has noted that a finding of "[a]s few as 174 jobs has been held to be significant." *Id.* at 743. Further, whether a job exists in "significant numbers" should be based on the national economy and the Commissioner is not required to establish that a job exists in the local area. *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

Here, Bruce alleges that the ALJ did not meet his burden of providing a job that exists in significant numbers. This argument fails because, as mentioned above, the Seventh Circuit has found that the availability of as few 174 jobs meets the requirement. Further, the ALJ is not required to establish that these jobs exist in Bruce's local economy. Given that 350 jobs as surveillance systems monitor exist in Indiana, and 21,000 exist at the national level, the ALJ's step-five determination that a significant number of jobs exists that Bruce could perform is supported by substantial evidence.

### III. CONCLUSION

This Court concludes that the ALJ's decision is supported by substantial evidence and free of legal error. First, the ALJ properly evaluated Bruce's impairments when determining her disability at step two. Second, the ALJ's RFC determination was consistent with the medical record and is supported by substantial evidence. Finally, the ALJ's determination at step five that Bruce could perform other jobs that existed in significant numbers in the national economy is supported by substantial evidence. Therefore, the undersigned **RECOMMENDS** that Bruce's motion to reverse or remand the Commissioner's decision be **DENIED** and that the Commissioner's decision be **AFFIRMED.**

> **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**
>
> **SO ORDERED**

Dated this 18th day of March, 2013.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge
